1  Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
2  5354 James Avenue
Oakland, CA  94618
3  Telephone: (510) 601-1309
Email:  craigabrandt@att.net

4

Attorney for Plaintiff
5  EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company, | Case No: |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** |
| vs. | **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |
| BLUE AND GOLD FLEET, a California corporation, and DOES 1-10, inclusive, | |
| Defendant. | |

16          Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

17  brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

18  Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

19                              **INTRODUCTION**

20      1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and

21  remediation against Defendant for current and ongoing violations of the National Pollutant

22  Discharge Elimination System ("NPDES") permit requirements of the CWA.

23      2.    On or about May 4, 2022, EDEN provided a Notice of Defendant's violations to

24  Defendant Blue and Gold Fleet ("BLUE & GOLD"), by certified mail, at Beach and

Embarcadero, Stairway 2, Level 3, San Francisco, California, ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.    On or about May 4, 2022, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) Port of San Francisco, and (5) Blue and Gold Fleet, Facility Manager.

4.    A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit A and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

5.    More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Water Resources Control Board ("State Board"), and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

7.    The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016).)

8.    By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

9.    Venue is proper because Defendant reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

10.    Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

11.    EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.  Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

12.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

13.     EDEN has members that reside, work and pursue recreational activities near the affected Receiving Waters. Defendant BLUE & GOLD discharges storm water into the San Francisco Bay which is the "Receiving Waters" for the Facility. Eden members use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

14.     EDEN has standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to Sue.

15.     Specifically, the individual member(s) who are experiencing harm from Defendant's violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 13, above, due to the pollution caused by Defendant's environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

16.     Defendant's ongoing violations of the California Industrial General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

17.     EDEN is informed and believes, and on such information and belief alleges, that Defendant BLUE & GOLD located at Pier 41 Marine Terminal, San Francisco, California, was formed on or about May 11, 1978, as a California corporation.

18.     EDEN is informed and believes, and on such information and belief alleges, that, Defendant BLUE & GOLD, on or about January 22, 2002, submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility. EDEN is further informed and believes, and on such information and belief alleges, that on or about November 12, 2015 Defendant BLUE & GOLD, submitted an NOT to be authorized to discharge storm water from the Facility under the California Industrial General Permit ("General Permit") and was assigned Waste Discharger Identification number ("WDID") 2 38I017036, according to the Regional Water Board's records.

19.     EDEN is informed and believes, and on such belief alleges that on July 25, 2022, Defendant BLUE & GOLD submitted a request to the Regional Water Quality Control Board a Notice of Non-Applicability.

## STATUTORY BACKGROUND

20.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

1  and state cooperation to develop and implement "programs for preventing, reducing, or

2  eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

3    21.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant

4  into waters of the United States, unless such discharge is in compliance with various enumerated

5  sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by,

6  or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33

7  U.S.C. § 1342.

8    22.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial

9  storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved

10  NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water

11  discharges through individual permits issued to dischargers or through the issuance of a single,

12  statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

13  1342(p).

14    23.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA

15  has authorized California's State Board to issue NPDES permits including general NPDES

16  permits in California.

17        General Permit

18    24.    The State Board elected to issue a statewide general permit for industrial storm water

19  discharges. The State Board originally issued the General Permit on November 19, 1991, and

20  modified it on September 17, 1992.  The State Board reissued the General Permit on April 17,

21  1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section

22  402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between

23

24

1   1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit

2   maintains or makes more stringent the same requirements as the 1997 Permit.

3   25.   In order to discharge storm water lawfully in California, industrial dischargers must

4   comply with the terms of the General Permit or have obtained and complied with an individual

5   NPDES permit. 33 U.S.C. § 1311(a).

6   26.   The General Permit contains several prohibitions. Effluent Limitation Section V.A of the

7   General Permit requires dischargers to reduce or prevent pollutants in their storm water

8   discharges through implementation of the Best Available Technology Economically Achievable

9   ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control

10   Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III.C of the

11   General Permit prohibits storm water discharges and authorized non-storm water discharges that

12   cause or threaten to cause pollution, contamination, or nuisance.

13   27.   Receiving Water Limitation Section VI.B of the General Permit prohibits storm water

14   discharges to any surface or ground water that adversely impact human health or the

15   environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D

16   of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any

17   applicable water quality standards contained in Statewide Water Quality Control Plan or the

18   applicable Regional Board's Basin Plan.

19   28.   In addition to absolute prohibitions, the General Permit contains a variety of substantive

20   and procedural requirements that dischargers must meet.  Facilities discharging, or having the

21   potential to discharge, storm water associated with industrial activity which have not obtained an

22   individual NPDES permit must apply for coverage under the State's General Permit by filing a

23

24

Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

29.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

30.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X.B.

31.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I .1.

32.    Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

33.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X.H.2.  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

34.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X.H.4, 5.

35.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

36.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

37.     Section XI.B of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

38.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI.B.2.

39.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI.B.4.

40.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI.A.

41.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

42.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI.B.6.c.

43.     The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water

discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

44.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

45.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

46.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII.A.

47.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII.C.

48.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the

exceedance is solely due to the presence of the pollutant in the natural background.  General

Permit Section XII.D.

49.    Section XVI.A. of the General Permit requires that all Dischargers must certify and

submit via SMARTS an Annual Report no later than July 15th following each reporting year

using the standardized format and checklists in SMARTS.

50.    Furthermore, Section XXI.L of the General Permit provides that all documents submitted

to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible

Person ("LRP") or Duly Authorized Representative ("DAR") of the Facility, with the following

certification:

> "I certify under penalty of law that this document and all Attachments were prepared
> under my direction or supervision in accordance with a system designed to assure that qualified
> personnel properly gather and evaluate the information submitted. Based on my inquiry of the
> person or persons who manage the system or those persons directly responsible for gathering the
> information, to the best of my knowledge and belief, the information submitted is, true, accurate,
> and complete. I am aware that there are significant penalties for submitting false information,
> including the possibility of fine and imprisonment for knowing violations."

51.    Section XXI.N of the General Permit provides that any person who knowingly makes any

false material statement, representation, or certification in any record or other document

submitted or required to be maintained under the General Permit, including reports of

compliance or noncompliance shall upon conviction, be punished by a fine of not more than

$10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act

section 309(c)(4)

San Francisco Bay Regional Basin Plan

52.    The Water Quality Control Board, San Francisco Bay Region has adopted the "San

Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by

Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

53.     The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

54.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

55.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

56.     The Basin Plan sets forth, among other things, narrative WQS for floating material, Oil & Grease, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

57.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

58.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI.A of the General Permit.

<u>Water Quality Impairment Area</u>

59.     The San Francisco Bay is listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

<u>Citizen Suit Provision of the CWA</u>

60.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

61.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any

1  permit condition or limitation implementing any of such sections in an NPDES permit shall be

2  subject to a civil penalty not to exceed $46,192 per day for each violation occurring before

3  November 2, 2015, and $51,570.00 per day per violation for violations occurring after November

4  2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

5  62.    Violations of provisions of the General Permit, including those detailed below, constitute

6  violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§

7  1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

8  **FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

9  63.    Defendant BLUE & GOLD is part of the industry that is primarily engaged in operating

10  ferries for the transportation of passengers and maintains a vehicle maintenance shop conducting,

11  among other things, fueling and lubrication operations at the Facility. General Permit,

12  Attachment A, <u>Transportation Facilities</u>, No. 8.

13  64.    EDEN is informed and believes that the Facility falls primarily within the standard

14  industrial classification ("SIC") Code 4482 – Ferries for transportation of passengers. The

15  General Permit requires establishments designated under SIC Code 4482 to test for the following

16  analytical parameters: Aluminum (Al), Iron (Fe), Lead (Pb), and Zinc (Zn). Table 2, of the

17  General Permit.

18  65.    According to the EPA's Stormwater Discharge Mapping Tools the Facility discharges

19  stormwater into the San Francisco Bay which is the "Receiving Waters" for the Facility. *See*,

20  EPA's Stormwater Discharge Mapping Tools, *available at https://www.epa.gov/npdes/epas-*

21  *stormwater-discharge-mapping-tools.*

22  66.    EDEN is informed and believes that Defendant BLUE & GOLD stores industrial

23  materials outdoors and/or on-site including diesel fuel, oil and lubricants that can be exposed to

24

storm water, or tracked from spills and leaks that otherwise contaminate the surrounding watershed.

67.    EDEN is informed and believes that based on its investigation, including a review of the Regional Water Board's records and aerial photography storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water that eventually discharges into the San Francisco Bay, a navigable Water of the United States.

68.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

69.    On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Defendant's Application for Notice of Non-Applicability is Not Allowed
Under the General Permit

70.    The General Permit allows facilities to remove themselves from stormwater runoff coverage by way of a valid "Notice of Non-Applicability ("NONA") that has been certified and uploaded onto the SMARTS system. *See*, General Permit, § II.S, Cal. Wat. Code, § 13399.30(a)(2).

71.     On July 25, 2022, Defendnat BLUE & GOLD erroneously applied to the Regional Water Board for NONA status. *See*, SMARTS, Attachment ID No. 3166212, 7/25/22, *Supporting Documentation – Notice of Non-Applicability for Pier 41 Marine Terminal, San Francisco, CA 94113*, p. 1.

72.     On information and belief, EDEN alleges Defendant seeks NONA status by wrongly claiming its industrial activities, which includes "fueling, and lubrication . . . are not associated with these specific activities [covered under the General Permit]." *Ibid.*

73.     On information and belief, EDEN alleges Defendant is *not* eligible for NONA status because it still conducts <u>land-based</u> industrial activities on its site, including, but not limited to, "*fueling, and lubricating*" operations. *See*, General Permit, Attachment A, No. 8, <u>Transportation Facilities</u>, *emphasis added*.

74.     On information and belief, EDEN alleges Defendant also seeks NONA status by incorrectly claiming Defendant's "[o]perations of B&Gs vessels are subject to the VGP [Vessel General Permit] and therefore cannot [also] be subject to the IGP." *Id*. p. 2, *citing* Section I.B.20 of the General Permit.

75.     On information and belief, EDEN alleges Defendant is *not* eligible for NONA status because the 2013 Vessel General Permit only covers "incidental discharges" <u>from</u> a vessel and does not apply to <u>land-based</u> industrial activities pursuant to the General Permit.

76.     On information and belief, EDEN alleges Defendant is *not* eligible for NONA status because its Facility will still discharge stormwater containing excessive amounts of pollutants including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel during rain events into the San Francisco Bay.

77.   On information and belief, EDEN alleges Defendant is registered under the Resource Conservation and Recovery Act ("RCRA"), Facility Registry Service No. 110054306489, because Defendant maintains an underground storage tank for diesel fuel and oily wastewater on its site.

78.   On information and belief, EDEN alleges Defendant is *not* eligible for NONA status because its Facility contains an underground storage tank for diesel fuel (9,000 gallons) and oily wastewater (4,000 gallons) which is subject to Subtitle C of RCRA. *See*, General Permit, Attachment A, No. 4, <u>Hazardous Waste Treatment and Storage, or Disposal Facilities</u>. All Facilities subject to RCRA are also required to have coverage under the General Permit. (*Ibid.*)

79.   On information and belief, EDEN alleges that every day since July 25, 2022, Defendant has not complied with any of the terms of the General Permit by, among other things: 1.)  failing to implement a  monitoring and reporting program, including, but not limited to, failing to conduct sampling and analysis of stormwater discharges; 2.) failing to implement its SWPPP; 3.) failing to implement minimum BMPs, BATs and BCTs at the Facility for the parameters of pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel, and 4.) for discharging contaminated stormwater into the Waters of the United States.

80.   Permit noncompliance constitutes a violation of the CWA and the California Water Code, is grounds for enforcement action against Defendant. *See*, General Permit, § XXI.A; 33 U.S.C. § 1342.

<u>Defendant's was Late in its Reapplication for the NPDES Permit Coverage</u>

81.   The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System ("NPDES") storm water permit, as these

operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the General Permit.

82.   BLUE & GOLD was required to apply for coverage under the General Permit in order to commence business operations, pursuant to Section I.Q of the General Permit. According to California Secretary of State records, BLUE & GOLD commenced its operations at the site on or before May 11, 1978.

83.   BLUE & GOLD was covered under the 1997 Industrial General Order, which expired on June 30, 2015, and was replaced by the 2014 Industrial General Permit, which became effective on July 1, 2015.  In order to continue regulatory coverage under the new Permit, BLUE & GOLD was required to complete a recertification process on or before August 14, 2015.  On information and belief, Plaintiff alleges the Regional Water Board issued two separate Notices of Noncompliance to the Facility, BLUE & GOLD for failing to recertify for General Permit coverage and was subsequently terminated from the program, effective August 15, 2015.

84.   On information and belief, Plaintiff alleges BLUE & GOLD did not in fact re-apply for coverage until November 12, 2015. Thus, between at least August 15, 2015 and November 12, 2015, BLUE & GOLD operated without NDPES Permit coverage.  On information and belief, Plaintiff alleges that during that time, BLUE & GOLD did not comply with any of the terms of the Permit, including implementing Best Management Practices, collecting and analyzing storm water runoff for pollution parameters, preparing and implementing a Storm Water Pollution Prevention Plan, or filing Annual Reports.

1  85.   Permit noncompliance constitutes a violation of the Clean Water Act and the Water

2  Code, is grounds for enforcement action against BLUE & GOLD and is further a violation of

3  Sections XXI.A of the General Permit.

4  Deficient SWPPP and Site Map

5  86.   On information and belief, Plaintiff alleges that since at least the beginning of the

6  Facility's operations, Defendant BLUE & GOLD has failed to develop an adequate SWPPP and

7  a Site Map for the Facility as detailed in Plaintiff's 60-Day Notice attached hereto as Exhibit A

8  and incorporated herein by reference. Exhibit A, "60-Day Notice of Violations and Intent to File

9  Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

10  87.   On information and belief, EDEN alleges that the Facility has failed to upload an

11  adequate revised SWPPP pursuant to Section X *et seq.* of the General Permit.

12  Monitoring and Reporting – Monthly Visual Observations

13  88.   On information and belief, EDEN alleges that Defendant BLUE & GOLD do not have an

14  adequate storm water monitoring program at its Facility since at least the beginning of the

15  Facility's operations, as required by Section XI.A of the General Permit.

16  89.   On information and belief, EDEN alleges that Defendant has failed to conduct monthly

17  visual observations of storm water discharges at the Facility since at least the beginning of the

18  Facility's operations, as required by the General Permit.

19  90.   Information available to EDEN indicates that as a result of these practices, stormwater

20  containing excessive pollutants, including, but not limited to, pH affected substances, TSS,

21  O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events

22  from the Facility to the San Francisco Bay.

23  Failure to Collect and Analyze the Required Number of Storm Water Samples

24

91.     The Defendant BLUE & GOLD required to collect and analyze two storm water samples from the first half of the reporting year (July 1 to December 31) and two storm water samples for the second half of the reporting year (January 1 to June 30), pursuant to Sections XI.B2 and XI.B11.a of the General Permit.

92.     On information and belief, Eden alleges that Defendant BLUE & GOLD failed to collect and analyze the required number of storm water samples at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

93.     On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendant did not collect and analyze any stormwater from the second half of the reporting year.

94.     On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendant failed to collect and analyze one storm water samples from the second half of the reporting year.

95.     On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant did not collect and analyze any storm water sample from the first half of the reporting year.

96.     On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant failed to collect and analyze one storm water samples from the second half of the reporting year.

97.     On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant did not collect and analyze any storm water sample from the first half of the reporting year.

98.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

99.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant failed to collect and analyze one storm water sample from the second half of the reporting year.

100.    On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendant failed to collect and analyze one storm water sample from the second half of the reporting year.

101.    On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

102.    On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze any storm water sample from the second half of the reporting year.

103.    On information and belief, EDEN alleges that during the 2021-2022 reporting year, Defendant failed to collect and analyze any storm water sample from the first half of the reporting year.

*(A Chart of the above narration is provided for further reference)*

| Reporting Year | QSE's Sampled in First Half | QSE's Sampled in Second Half |
|---|---|---|
| 2015-16 | 2 | 0 |
| 2016-17 | 2 | 1 |
| 2017-18 | 0 | 1 |
| 2018-19 | 1 | 1 |
| 2019-20 | 2 | 1 |

| | | |
|---|---|---|
| 2020-21 | 1 | 0 |
| 2021-22 | 0 | n/a |
| Total Sampled | 8 | 4 |
| QSE's Required | 14 | 12 |
| **QSE's Missing** | **6** | **8** | **14 Total** |

104.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Collect Storm Water Samples During Qualified Storm Events</u>

105.     On information and belief, EDEN alleges that Defendant BLUE & GOLD has taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that storm water samples be preceded by a 48-hour period without a discharge, pursuant to Section XI.B of the General Permit.

106.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 20, 2015 was not valid because it was made on the third consecutive day of rainfall on that date in violation of the General Permit.

107.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on November 22, 2016 was not valid because it was not preceded by 48 hours of no discharge of rainfall on that date in violation of the General Permit.

108.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 9, 2016 was not valid because it was made on the third consecutive day of rainfall, in violation of the General Permit.

109.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 6, 2018 was not valid because no rainfall was recorded on that date, in violation of the General Permit.

110.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on November 30, 2018 was not valid because no rainfall was recorded on that date, in violation of the General Permit.

111.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 16, 2019 was not valid because no rainfall was recorded on that date, in violation of the General Permit.

112.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 2, 2019 was not valid because it was made on the third consecutive day of rainfall, in violation of the General Permit.

113.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 4, 2019 was not valid because it was not preceded by 48 hours of no discharge of rainfall on that date in violation of the General Permit.

114.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 10, 2020 was not valid because no rainfall was recorded on that date, in violation of the General Permit.

115.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 20, 2015 was not valid because it was made on the second consecutive day of rainfall on that date in violation of the General Permit.

116.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS,

O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Deliver Samples to a Laboratory Within 48 Hours of Collection

117.    Pursuant to Attachment H, Section 2 of the General Permit, Discharges are required to deliver stormwater run-off samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.

118.    On information and belief, EDEN alleges that Defendant's stormwater sample collected on December 23, 2015, was delivered to the Laboratory one day late.

119.     On information and belief, EDEN alleges that Defendant's stormwater sample collected on May 26, 2016, was delivered to the Laboratory 208 days late.

120.    On information and belief, EDEN alleges that Defendant's stormwater sample collected on January 6, 2018, was delivered to the Laboratory 366 days late.

121.    On information and belief, EDEN alleges that Defendant's stormwater sample collected on January 16, 2019, was delivered to the Laboratory one day late.

122.    On information and belief, EDEN alleges that Defendant's stormwater sample collected on December 12, 2020, was delivered to the Laboratory three days late.

123.    On information and belief, EDEN alleges that Defendant has failed to timely deliver stormwater samples to a laboratory within the required 48-hour period, a violation of the General Permit.

Failure to Analyze Stormwater Samples for the pH Parameter

124.    The General Permit Sections X.I.B.6 and X.I.B.6.b require all Dischargers to analyze for the following three parameters regardless of the facility category; pH, TSS and O&G.

125.    On information and belief, EDEN alleges that all of Defendant's laboratory reports from 2015 through 2010, except for the reports dated November 28, 2019 and January 16, 2020, failed to analyze for the required parameter of pH, for a total of ten times, a violation of the General Permit.

126.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Upload Stormwater Sample Analyses Within 30 Days

127.    Defendant BLUE & GOLD is required to submit sampling and analytical test results for all stormwater sampling by uploading the data into the SMARTS system within thirty (30) days, pursuant to Section XI.B.11 of the General Permit.

128.    On information and belief, EDEN alleges that Defendant failed to upload into SMARTS all storm water sampling and analytical results within thirty (30) days, from the year 2015 through the year 2020, a violation of the General Permit.

Failure to Collect Samples from all Discharge Locations

129.    Section XI.B.4 of the General Permit requires Defendant to collect samples from all discharge locations, regardless of whether the discharges are substantially similar. Defendant may analyze a combined sample consisting of equal volumes, collected from as many as four substantially similar discharge locations, provided that Defendant submits a Representative Sampling Reduction Justification form with its sample analysis, and the samples are combined in the laboratory in accordance with Section XI.C.5 of the General Permit.  Furthermore, Representative sampling is only allowed for sheet flow discharges or discharges from drainage areas with multiple discharge locations.

130.    According to Defendant BLUE & GOLD's current SWPPP and Site Map, the Facility has one (1) discharge location listed as "B" with a sample description of "Storm Drain adjacent to UST [Underground Storage Tank] fuel loading area." The Facility's SWPPP and Site Map also described other sample locations as SL 1, SL 2, BG 1, BGF-SF, and Pier 41.

131.    On information and belief, EDEN alleges Defendant's underground storage tank has two compartments with one side holding about 9,000 gallons of diesel fuel and the other containing about 4,000 gallons of oily wastewater.

132.    On information and belief, EDEN alleges Defendant did not collect any stormwater samples from Sample Location B, which is the sample area closest to the underground storage tank containing diesel fuel' from the year 2015 through the year 2020.

133.    On information and belief, EDEN alleges Defendant did not collect stormwater samples from all the required locations nor did Defendant submit a Representative Sampling Reduction Justification form with its sample analysis which is a violation of Section XI.C.5, of the General Permit.

134.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events from the Facility to the San Francisco Bay.

         Deficient Implementation of BAT/BCT and Minimum Best Management Practices

135.    EDEN is informed and believes that Defendant BLUE & GOLD has failed, since at least the beginning of the Facility's operations, to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best

1    conventional treatment (BCT) for conventional pollutants, and best available technology (BAT)

2    for toxic and non-conventional pollutants. General Permit Sections I.C, V.A.

3    136.    EDEN is informed and believes that Defendant has failed, since at least the beginning of

4    the Facility's operations, to identify and implement Minimum BMPs including, but not limited

5    to, measures for checking for spills and leaks; procedures to prevent material tracking,

6    implementing adequate clean-up methods for industrial materials; and protocols preventing the

7    disposal of industrial materials into the stormwater conveyance system.  General Permit Section,

8    X.H.1.a.i-ix.

9    137.    On information and belief, EDEN alleges Defendant's has on site an underground storage

10   tank containing about 9,000 gallons of diesel fuel with a separate compartment that contains

11   about 4,000 gallons of oily wastewater.

12   138.    On information and belief, EDEN alleges Defendant regularly has diesel fuel transferred

13   from trucks into the underground storage tank located on its Facility.

14   139.    On information and belief, Eden alleges Defendant conveys diesel fuel from the

15   underground storage tank by a series of pipelines to three docks where diesel fuel pump hoses

16   and meters pump diesel fuel into the ferries.

17   140.    On information and belief, Eden alleges that during Defendant's fueling operations spills

18   and/or leaks of diesel fuel occur at the Facility which are then subject to stormwater exposure

19   and/or tracking that conveys these pollutants into the San Francisco Bay.

20   141.    Information available to EDEN indicates that as a result of these practices, stormwater

21   containing excessive pollutants, including, but not limited to, pH affected substances, TSS,

22   O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events

23   from the Facility to the San Francisco Bay.

24

142.    On information and belief, EDEN alleges that Defendant regularly has oily wastewater transferred from its ferries into the underground storage tank that has a separate compartment with a capacity of about 4,000 gallons located on its Facility.

143.    On information and belief, EDEN alleges that Defendant has its oily wastewater transferred from its underground storage tank onto trucks for hauling off site.

144.    On information and belief, Eden alleges that during Defendant's transferring of oily wastewater operations spills and/or leaks occur at the Facility which are then subject to stormwater exposure and/or tracking that conveys these pollutants into the San Francisco Bay.

145.    On information and belief, EDEN alleges Defendant stores at the Facility 55-gallon drums of lubricant oil and five-gallon buckets of lubricant.

146.    On information and belief, EDEN alleges and that during the use and/or transferring of lubricants that spills and/or leaks occur at the Facility which are then subject to stormwater exposure and/or tracking that conveys these pollutants into the San Francisco Bay.

147.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to File Timely Annual Reports</u>

148.    EDEN is informed and believes that Defendants have failed to comply with Section XVI.A of the General Permit, which provides that Dischargers shall certify and submit by way of SMARTS an Annual Report no later than July 15th following each reporting year.

149.    The Annual Report shall include a Compliance Checklist that indicates whether the Discharger has addressed all the General Permit requirements; an explanation for any non-

compliance with the General Permit requirements, and an identification of all revisions made to the SWPPP within the reporting year.

150.    On information and belief, Eden alleges that Defendants failed to timely file their Annual Report for the reporting years 2016-17, by late filing it on September 19, 2017, in violation of the General Permit.

Discharges of Contaminated Storm Water

151.    Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges in violation of the General Permit.

152.    Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.  These pollutants include, but not limited to, storm water contaminated with, but not limited to, pH affected substances, oil & grease, total suspended solids, Aluminum, Iron, Lead, Zinc, and THP-Diesel.

153.    For the Reporting Year 2015-2016 the aluminum level detected at the Facility was measured at 0.60 mg/L which exceeded the annual NAL for aluminum of 0.75 mg/L established by the General Permit.

154.    For the Reporting Year 2015-2016 the iron level detected at the Facility was measured at 2.50 mg/L which exceeded the annual NAL for iron of 1.0 mg/L established by the General Permit.

155.    For the Reporting Year 2015-2016 the total suspended solids level detected at the Facility was measured at 129.50 mg/L which exceeded the annual NAL for total suspend solids of 100 mg/L established by the General Permit.

156.    For the Reporting Year 2015-2016, the zinc level detected at the Facility was measured at 0.36 mg/L which exceeded both the annual NAL of 0.26 and the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

157.    For the Reporting Year 2016-2017 the aluminum level detected at the Facility was measured at 0.76 mg/L which exceeded the annual NAL for aluminum of 0.75 mg/L established by the General Permit.

158.    For the Reporting Year 2016-2017 the iron level detected at the Facility was measured at 1.19 mg/L which exceeded the annual NAL for iron of 1.0 mg/L established by the General Permit.

159.    For the Reporting Year 2016-2017, the zinc level detected at the Facility was measured at 0.22 mg/L which exceeded the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

160.    For the Reporting Year 2017-2018 the iron level detected at the Facility was measured at 1.72 mg/L which exceeded the annual NAL for iron of 1.0 mg/L established by the General Permit.

161.    For the Reporting Year 2017-2018, the zinc level detected at the Facility was measured at 0.77 mg/L which exceeded both the annual NAL of 0.26 and the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

162.    For the Reporting Year 2018-2019, the zinc level detected at the Facility was measured at 0.23 mg/L which exceeded the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

163.    For the Reporting Year 2019-2020 the iron level detected at the Facility was measured at 1.27 mg/L which exceeded the annual NAL for iron of 1.0 mg/L established by the General Permit.

164.    For the Reporting Year 2019-2020 the total suspended solids level detected at the Facility was measured at 117 mg/L which exceeded the annual NAL for total suspended solids of 100 mg/L established by the General Permit.

165.    For the Reporting Year 2019-2020, the zinc level detected at the Facility was measured at 0.30 mg/L which exceeded both the annual NAL of 0.26 and the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

166.    For the Reporting Year 2020-2021 the aluminum level detected at the Facility was measured at 8.18 mg/L which exceeded the annual NAL for aluminum of 0.75 mg/L established by the General Permit.

167.    For the Reporting Year 2020-2021 the iron level detected at the Facility was measured at 29.40 mg/L which exceeded the annual NAL for iron of 1.0 mg/L established by the General Permit.

168.    For the Reporting Year 2020-2021 the lead level detected at the Facility was measured at 0.37 mg/L which exceeded both the annual NAL for lead of 0.26 mg/L established by the General Permit and the Water Quality Objectives for lead of 0.21 mg/L established by the Basin Plan, Table 3-3 notes a and b.

169.   For the Reporting Year 2020-2021 the oil and grease level detected at the Facility was measured at 222.20 mg/L which exceeded the annual NAL for oil and grease of 15.00 mg/L established by the General Permit.

170.   For the Reporting Year 2020-2021 the total suspended solids level detected at the Facility was measured at 319 mg/L which exceeded the annual NAL for total suspended solids of 100 mg/L established by the General Permit.

171.   For the Reporting Year 2020-2021, the zinc level detected at the Facility was measured at 8.53 mg/L which exceeded both the annual NAL of 0.26 and the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

172.   On November 2, 2015, the TPH-Diesel level detected at the Facility was measured at 2.20 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

173.   On November 2, 2015, the TPH-Diesel level detected at the Facility was measured at 1.20 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

174.   On November 2, 2015, the TPH-Diesel level detected at the Facility was measured at 1.1 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

175.   On November 22, 2016, the TPH-Diesel level detected at the Facility was measured at 0.46 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established

by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

176.    On December 9, 2016, the TPH-Diesel level detected at the Facility was measured at 0.56 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

177.    On January 6, 2018, the TPH-Diesel level detected at the Facility was measured at 0.59 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

178.    On November 30, 2018, the TPH-Diesel level detected at the Facility was measured at 2.60 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

179.    On January 16, 2019, the TPH-Diesel level detected at the Facility was measured at 0.31 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

180.    On November 22, 2016, the TPH-Diesel level detected at the Facility was measured at 0.46 mg/L which exceeded the Effluent Limitations of  0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

181.    On November 30, 2018, the TPH-Diesel level detected at the Facility was measured at 0.2.60 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

182.    On January 16, 2019, the TPH-Diesel level detected at the Facility was measured at 0.31 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

183.    On December 2, 2019, the TPH-Diesel level detected at the Facility was measured at 1.10 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

184.    On December 4, 2019, the TPH-Diesel level detected at the Facility was measured at 1.40 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

185.    On January 10, 2020, the TPH-Diesel level detected at the Facility was measured at 0.47 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

186.    On December 12, 2020, the TPH-Diesel level detected at the Facility was measured at 1.60 mg/L which exceeded the Effluent Limitations of 0.050 mg/L for TPH-Diesel established

by the Regional Water Quality Control Board, Order No. R2-2018-0053, Table 2, Effluent Limitations, at p. 3.

187.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel are being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Conduct an Evaluation and to Submit a Level 1 ERA Report for Aluminum, Iron, TSS, and Zinc</u>

188.    On information and belief, Plaintiff alleges that the Facility exceeded the EPA Benchmark and annual NAL for Aluminum, Iron, TSS, and Zinc for the reporting year 2015-16 which caused Defendant to enter Level 1 status on July 1, 2016, in violation of Section XII *et seq.* of the General Permit.

189.    On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2016, and to upload an adequate Level 1 ERA Report for Aluminum, Iron, TSS, and Zinc on or before January 1, 2017.

190.    On information and belief, EDEN alleges that the Facility has failed to have a QISP conduct an adequate Level 1 status Evaluation for Aluminum, Iron, TSS, and Zinc of the Facility by October 1, 2016.

191.    On information and belief, EDEN alleges that the Facility has failed to submit a Level 1 ERA Report for Aluminum, Iron, TSS, and Zinc by uploading it to SMARTS on or before January 1, 2017.

192.    Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit.

<u>Failure to Submit Level 2 ERA Action Plan for Aluminum and Iron</u>

193.    On information and belief, EDEN alleges that Defendant, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for Aluminum and Iron for the reporting year 2016-17 and these results elevated Defendant to Level 2 status on July 1, 2017, in violation of Section XII *et seq.* of the General Permit.

194.    On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Action Plan that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility.

195.    On information and belief, EDEN alleges that after Defendant enter Level 2 status for Aluminum and Iron, Defendant failed to upload to SMARTS a Level 2 Action Plan on or before January 1, 2018.

196.    Everyday Defendant conducts operations at the Facility without preparing a Level 2 Technical Report for Aluminum and Iron is a separate and distinct violation of the General Permit.

<u>Failure to Submit Level 2 ERA Technical Report for Aluminum and Iron</u>

197.    On information and belief, EDEN alleges that Defendant, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for Aluminum and Iron for the reporting year 2016-17 and these results elevated Defendant to Level 2 status on July 1, 2017, in violation of Section XII *et seq.* of the General Permit.

198.    On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Technical Report that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility.

199.    On information and belief, EDEN alleges that after Defendant enter Level 2 status for Aluminum and Iron, Defendant failed to upload to SMARTS a Level 2 Technical Report on or before January 1, 2019.

200.    Everyday Defendant conducts operations at the Facility without preparing a Level 2 Technical Report for Aluminum and Iron is a separate and distinct violation of the General Permit.

<u>Failure to Submit Level 2 ERA Action Plan for Zinc</u>

201.    On information and belief, EDEN alleges that the Facility, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for Zinc for the reporting year 2017-18 and these results elevated Defendnat to Level 2 status on July 1, 2018, in violation of Section XII *et seq.* of the General Permit.

202.    On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Action Plan that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility on or before January 1, 2019.

203.     On information and belief, EDEN alleges that Defendant has failed to upload to SMARTS a Level 2 Action Plan for Zinc on or before January 1, 2019.

204.    Everyday Defendant conducts operations at the Facility without preparing a Level 2 Action Plan is a separate and distinct violation of the General Permit.

Failure to Submit Level 2 ERA Technical Report for Zinc

205.     On information and belief, EDEN alleges that Defendant, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for Zinc for the reporting year 2017-18 and these results elevated Defendant to Level 2 status on July 1, 2018, in violation of Section XII *et seq.* of the General Permit.

206.     On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Technical Report that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility.

207.     On information and belief, EDEN alleges that after Defendant enter Level 2 status for Zinc, Defendant failed to upload to SMARTS a Level 2 Technical Report on or before January 1, 2019, a violation of Section XII *et seq.* of the General Permit.

208.     Everyday Defendant conducts operations at the Facility without preparing a Level 2 Technical Report for Zinc is a separate and distinct violation of the General Permit.

Failure to Submit Level 2 ERA Action Plan for TSS

209.     On information and belief, EDEN alleges that the Facility, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for TSS for the reporting year 2019-20 and these results elevated Defendnat to Level 2 status on July 1, 2020, in violation of Section XII *et seq.* of the General Permit.

210.     On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Action Plan that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility on or before January 1, 2021.

211.      On information and belief, EDEN alleges that Defendant has failed to upload to SMARTS a Level 2 Action Plan for TSS on or before January 1, 2021.

212.     Everyday Defendant conducts operations at the Facility without preparing a Level 2 Action Plan is a separate and distinct violation of the General Permit.

<u>Failure to Submit Level 2 ERA Technical Report for TSS</u>

213.     On information and belief, EDEN alleges that Defendant, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for TSS for the reporting year 2019-20 and these results elevated Defendant to Level 2 status on July 1, 2020, requiring Defendant to upload a Level 2 ERA Action Plan by January 1, 2021, and then a Level 2 ERA Technical Report by January 1, 2022.

214.     On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Technical Report that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility.

215.     On information and belief, EDEN alleges that after Defendant failed to upload to SMARTS a Level 2 Technical Report for TSS on or before January 1, 2022, a violation of Section XII *et seq.* of the General Permit.

216.     Everyday Defendant conducts operations at the Facility without preparing a Level 2 Technical Report for TSS is a separate and distinct violation of the General Permit.

<u>Failure to Update and Amend the SWPPP</u>

217.     On information and belief, EDEN alleges Defendant failed to upload an adequate SWPPP to SMARTS pursuant to the mandates of the Regional Water Quality Control Board and the General Permit.

218.     On information and belief, EDEN alleges Defendant entered into Level 1 status and Level 2 status and both of these categories require there be BMP revisions to update and/or amend the SWPPP.

219.    On information and belief, EDEN alleges Defendant has failed to upload an amended and updated SWPPP a violation of Sections X.B and XII.C.2.a of the General Permit.

Falsification of Annual Reports

220.    EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI.L and XXI.N of the General Permit.

221.    Section XI.B of the General Permit provides that the Facility must collect and analyze two storm water samples in the first half of each reporting year (July 1 to December 31), and two samples in the second half of each reporting year (January 1 to June 30).

222.    On June 24, 2016, September 19, 2017, July 12, 2018, May 8, 2019, and June 15, 2020 Defendant submitted its Annual Reports for the Fiscal Years 2015-16, 2016-7, 2017-18, 2018-19, and 2019-20. Mr. Kent McGrath under penalty of perjury as the Designated Authorized Representative ("DAR").

223.    Mr. McGrath responded "Yes" to Question No. 3 on their Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")

224.    On information and belief, EDEN alleges Defendant's DAR has failed to collect and analyze all the required storm water samples during reporting years in question.

225.     If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Facility to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected. The explanation as to why there were insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

1   226.    Records from the National Oceanic and Atmospheric Administration (NOAA)

2   website/database confirm that during the reporting years 2015 through 2022, there were

3   sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours

4   of the start of regular business hours to allow Defendant to collect the requisite number of

5   samples. Further, there were other Facilities near the Defendant's Facility that were able to

6   collect the required number of storm water samples during the Reporting Years.

7   227.    Based on the foregoing, it is clear that Defendant's DAR intentionally made false

8   statements in the Facility's Annual Reports when he indicated that the Facility had collected

9   samples according to Section XI.B of the General Permit during the reporting years when in fact

10  the Facility did not collect the required number of samples, which is a violation of the General

11  Permit.

12              Failure to Comply with Facility's SWPPP

13  228.    Section 5.6.1 "Sample Schedule" of Defendant's SWPPP states the Facility will collect

14  and analyze stormwater samples from two QSEs within the first half of each reporting year (July

15  1 to December 31) and two QSEs within the second half of each reporting year (January 1 to

16  June 30).

17  229.    On information and belief, EDEN alleges Defendant missed collecting the required

18  number of stormwater samples in the reporting years 2015 through 2022, which is a violation of

19  the Facility's SWPPP and Section X.H.g of the General Permit.

20  230.    Table 5.5 of Section 5.6.4 "Analytical Constituents" of Defendant's SWPPP identifies the

21  parameters for which the Facility's stormwater run-off samples must be analyzed, including pH

22  affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel.

23

24

231.    On information and belief, EDEN alleges Defendant failed to upload onto SMARTS system all the times it was required upload for the parameter pH, which is a violation of the Facility's SWPPP and Section X.H.g of the General Permit.

                    Failure to Train Employees

232.    Sections X.D.1 and X.H.f of the General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

233.    Defendant's failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

234.    On information and belief, Eden alleges that Defendant BLUE & GOLD failed to appoint a Pollution Prevention Team and/or adequate train its pollution prevention team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

235.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel is being discharged during rain events from the Facility to the San Francisco Bay.

236.    Information available to Plaintiff indicates that Defendant has not fulfilled the

requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

**FIRST CAUSE OF ACTION**
**Defendant's Application for Notice of Non-Applicability is**
**Not Allowed Under the General Permit**
**(Federal Resource, Conservation, and Recovery Act)**

237.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

238.   The General Permit allows facilities to remove themselves from General Permit coverage by way of a valid "Notice of Non-Applicability ("NONA")" that has been certified and uploaded onto the SMARTS system.

239.   On July 25, 2022, Defendnat BLUE & GOLD wrongly applied to the Regional Water Board for NONA status.

240.   Defendant is *not* eligible for NONA status because its Facility still discharges stormwater containing excessive amounts of pollutants including, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel during rain events into the San Francisco Bay.

241.   Defendant is *not* eligible for NONA status because it still conducts land-based industrial activities on its site, including, but not limited to, "fueling and lubricating" operations. *See*, General Permit, Attachment A, No. 8, Transportation Facilities.

242.   Defendant is registered the under the Resource Conservation and Recovery Act ("RCRA"), Facility Registry Service No. 110054306489, because Defendant maintains an underground storage tank for diesel fuel and oily wastewater on its site.

243.    Defendant is *not* eligible for NONA status because its Facility contains an underground storage tank for diesel fuel (9,000 gallons) and oily wastewater (4,000 gallons) which is subject to Subtitle C of RCRA. *See*, General Permit, Attachment A, No. 4, <u>Hazardous Waste Treatment and Storage, or Disposal Facilities</u>. All Facilities subject to RCRA are required to have coverage under the General Permit. (*Ibid*.)

244.    Defendant is *not* eligible for NONA status because the 2013 Vessel General Permit only covers "incidental discharges" <u>from</u> a vessel and does not apply to <u>land-based</u> industrial activities pursuant to the General Permit and constitutes a violation of CWA against Defendant. *See*, General Permit, § XXI.A; 33 U.S.C. § 1342.

245.    Every day since July 25, 2022, Defendant has not complied with any of the terms of the General Permit by, among other things: 1.)  failing to implement a  monitoring and reporting program, including, but not limited to, failing to conduct sampling and analysis of stormwater discharges; 2.) failing to implement its SWPPP; 3.) failing to implement minimum BMPs, BATs and BCTs at the Facility for the parameters of pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel, and 4.) for discharging contaminated stormwater into the Waters of the United States.

246.    Permit noncompliance constitutes a violation of the CWA and the California Water Code, is grounds for enforcement action against Defendant. *See*, General Permit, § XXI.A; 33 U.S.C. § 1342.

**SECOND CAUSE OF ACTION**
**Failure to Develop a Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

247.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

248.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement a SWPPP and create a compliant Site Map.

249.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP or Site Map for the Facility.

250.    Each day since at least the beginning of the Facility's operations, that Defendants failed to develop an adequate SWPPP and Site Map for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**THIRD CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

251.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

252.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

253.    As outlined herein, Defendant has failed to develop and implement a monitoring and reporting program for its Facility.

254.    Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

255.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section

301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant. The absence of requisite

monitoring and analytical results are ongoing and continuous violations of the Act.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

256.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

257.    The General Permit's SWPPP requirements and Effluent Limitation Section V.A of the

General Permit require dischargers to reduce or prevent pollutants in their storm water

discharges through implementation of BAT for toxic and nonconventional pollutants and BCT

for conventional pollutants.

258.    Defendant has failed to implement BAT and BCT at the Facility for pollutants of pH

affected substances, Total Suspended Solids ("TSS") and Oil & Grease and other potentially un-

monitored pollutants, in violation of Effluent Limitation Section V.A of the General Permit.

259.    Each day since at least the beginning of the Facility's operations, that Defendant has

failed to develop and implement BAT and BCT in violation of the General Permit is a separate

and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a)

against the Defendant.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

260.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

herein.

261.     Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

262.     Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the General Permit.

263.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with, but not limited to, pH affected substances, TSS, O&G, Aluminum, Iron, Lead, Zinc, and THP-Diesel and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

264.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

265.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

266.    Every day since at least the beginning of Facility's operations, that Defendant has discharged and continues to discharge polluted stormwater from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.  These violations are ongoing and continuous.

**SIXTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

267.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

268.    Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

269.    Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

270.    Since at least the beginning of Facility's operations, Defendant has failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

### SEVENTH CAUSE OF ACTION
### Recovery Under the Catalyst Theory CCP §1021.5

271.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

272.    Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal. Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

273.    A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendant prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit A and incorporated herein by reference. Exhibit A, 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

274.    In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

275.    Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1. Declare Defendant to have violated and to be in violation of the CWA;

2. Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3. Enjoin Defendant from seeking a Notice of Non-Applicability;

3. Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4. Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5. Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6. Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7. Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.


Dated:  August 3, 2022                    Respectfully,


                                          By: */s/ Craig A. Brandt*
                                              Craig A. Brandt
                                              Attorney for Plaintiff